UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6|11|19

MALE DIXON aka JAMES KING,

          Plaintiff,

   -against-

BARBARA VON BLACKENSEE –WARDEN OF
THE OTISVILLE CORRECTIONAL FACILITY, *in
her individual and official capacity*,

          Defendants.

No. 17-cv-7359 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

      Plaintiff Male Dixon aka James King ("King" or "Plaintiff"), a *pro se* incarcerated inmate at the U.S Penitentiary at Terre Huate, Indiana, commenced this action on or about September 25, 2017. (Complaint, ("Compl."), ECF No. 1.) In this action, he brings claims against Barbara Von Blackensee, a former Warden of Otisville Correctional Facility, in her individual and official capacity, pursuant to 42 U.S.C. § 1983 and under *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 397, 91 S.Ct. 1999 (1971), which allows a cause of action for damages against federal agents who violate certain constitutional rights. On February 5, 2018, Plaintiff filed his Second Amended Complaint. (Second Amended Complaint, ("SAC"), ECF No. 9.) Before the Court is Defendants' Motion to Dismiss the SAC pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 24.)

      For the following reasons, Defendants' Motion is GRANTED in part and DENIED in part.

# BACKGROUND

The following facts are derived from the Complaint, SAC, documents appended thereto, and docket entries. They are assumed to be true for the purposes of this motion.

Plaintiff alleges that in 2015, he commenced an action in Pennsylvania state court. (ECF No. 1 ¶ 1.) On or about December 17, 2015, while incarcerated at the Federal Corrections Institution in Otisville, New York ("FCI Otisville"), Barbara Von Blackensee ("Defendant" or "Blackensee"), the Warden of FCI Otisville at the time, disobeyed or refused to honor a state court order ("Transport Order"), requesting that Plaintiff be released into the custody of local Pennsylvania officials so that he could appear, in person, on January 26, 2016, for a hearing in his state court action. (*Id.* ¶¶ 5-8.)

By Order, dated December 13, 2017, this Court dismissed Plaintiff's initial Complaint, pursuant to FRCP § 12(h)(3) for lack of subject matter jurisdiction. (ECF No. 7.) The Court determined Plaintiff failed to allege sufficient facts to assert a plausible claim. (*Id.*) Among the deficiencies, was Plaintiff's failure to allege facts to support a finding of actual harm. (*Id.*) ("Plaintiff has failed to allege any facts showing that (1) his Pennsylvania state-court § 1983 action is/was viable, or (2) Von Blackenesee frustrated or hindered his litigation of that action by not allowing him to appear at the January 26, 2016 hearing.") The Court then granted Plaintiff an extension of time to file an amended complaint. (*Id.*)

On January 26, 2018, Plaintiff timely filed an amended complaint (Amended Complaint, ("AC"), ECF No. 8.) In it, he asserted claims pursuant to § 1983 under the First, Fifth, Sixth and Seventh Amendments.[1]

---

[1] In the AC, Plaintiff alleged that he previously filed a "Civil Rights" action against two peace officers for assault and battery, including cruel and unusual punishment. On January 26, 2016, while in custody at FCI Otisville, New York, "the defendant Warden refused to obey a court order, which directed her to deliver this plaintiff to the court by allowing the local Sheriff to take custody of the plaintiff." Due to the Warden's failure to release Plaintiff to the custody of the

Less than two weeks later, Plaintiff filed the SAC, which was nearly identical and to the AC, and which is the subject of the instant motion. (*See* SAC.) On July 20, 2018, Defendants filed their Motion to Dismiss Plaintiff's SAC pursuant to Fed.R.Civ. P. 12(b)(1) and 12(b)(6). (Defendants' Motion to Dismiss ("Def. Mot."), ECF No. 24.)

## STANDARDS OF REVIEW

### Rule 12(b)(1)

On a motion to dismiss pursuant to FRCP §12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). "[T]he court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000). Though a court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, [it] may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004).

### Rule 12(b)(6)

Under Rule 12(b)(6), the inquiry for motions to dismiss is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

---

local Sheriff for the purpose of prosecuting his state court Civil Rights action, the case was dismissed. As a result of the dismissal, Plaintiff was deprived of property. Plaintiff alleges that Defendant's conduct was for "retaliation, spite, and a desire to inflict punishment and not for a legitimate reason.

its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" to credit "mere conclusory statements," or to accept "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Id.* at *679.* A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

Generally, when considering a FRCP § 12(b)(6) motion, the court may consider the facts in the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken. *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir.1999) (internal quotation marks omitted). On a FRCP § 12(b)(6) motion, however, the court may not consider evidence proffered by the moving party or its opponent. *Thomas v. Calero*, 824 F. Supp. 2d 488, 497 (S.D.N.Y. 2011).

When a plaintiff proceeds *pro se*, as in this case, a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations. *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004) citing *Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir.2001). A *pro se* plaintiff, however, is still bond by the plausibility requirement articulated in *Twombly* and *Iqbal*. *Thomas v. Calero*, 824 F. Supp. 2d 488, 497 (S.D.N.Y. 2011) (internal citations omitted).

**42 U.S.C. § 1983**

42 U.S.C. Section 1983 provides, in relevant part, that:"[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). To state a claim under § 1983, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York*, No. 09 Civ. 5446, 2013 WL 1803896, at *2 (S.D.N.Y. April 25, 2013); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). Therefore, a Section 1983 claim has two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges. *See Annis v. Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 354 (E.D.N.Y. 1999) (noting that Section 1983 "furnishes a cause of action for the violation of federal rights created by the Constitution") (citation omitted).

### Bivens v. Six Unknown Agents

Under *Bivens* and its progeny, federal courts can hear suits for money damages against federal government officials accused of violating certain constitutional rights. *Bivens* 403 U.S. at 396–97; *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66, 122 S.Ct. 515, 519 (2001) ("In *Bivens* ... we recognized for the first time an implied private action for damages against federal officers

alleged to have violated a citizen's constitutional rights."); *Schweiker v. Chilicky*, 487 U.S. 412, 421, 108 S.Ct. 2460, 2466 (1988) ("In [*Bivens*], this Court held that the victim of a Fourth Amendment violation by federal officers acting under color of their authority may bring suit for money damages against the officers in federal court."); *Carlson v. Green*, 446 U.S. 14, 18–19, 100 S.Ct. 1468, 1471 (1980) ("*Bivens* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right.").

"'*Bivens* actions are not significantly dissimilar to claims brought under [42 U.S.C.] §§ 1981 and 1983 in terms of the interests being protected, the relief which may be granted and the defenses which may be asserted.'" *Chin v. Bowen*, 833 F.2d 21, 23–24 (2d Cir.1987). "Because the two actions share the same 'practicalities of litigation,' federal courts have typically incorporated § 1983 law into *Bivens* actions." *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir.1995) (citation omitted). Like § 1983 claims, *Bivens* actions preclude vicarious liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937, 1948 (2009) ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.") Hence, to prevail on a *Bivens* claim, a plaintiff must plead that there was a violation of a clearly established constitutional right and that a defendant was personally involved in the alleged wrong.

Further, while *Bivens* invited a private right of action under the Fourth Amendment, the Supreme Court has extended *Bivens* claims in two more circumstances: the Fifth Amendment's Due Process Clause and the Eighth Amendment's Cruel and Unusual Punishment Clause. *See Davis v. Passman*, 442 U.S. 228, 99 S. Ct. 2264 (1979) (extending *Bivens* to the Fifth Amendment); *Carlson v. Green*, 446 U.S. 14, 100 S. Ct. 1468 (1980) (extending *Bivens* to the

Eight Amendment). Recently, the Supreme Court told courts to take a more "cautious" approach to *Bivens* actions and not accept them in new contexts. *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ("expanding the *Bivens* remedy is now considered a "disfavored" judicial activity.")

## DISCUSSION

### I.      Claims Against Blackensee in her Official Capacity

Defendants first argue that Plaintiff's claims against Blackenesee in her official capacity are barred by FRCP 12(b)(1) because Congress has not waived agencies' sovereign immunity for constitutional torts. (*See* Defendants' Memorandum of Law, ("Def. Mem."), ECF No. 25, at 4.)

Plaintiff does not contest Defendants' argument. While Plaintiff makes many novel arguments about the constitutionality of not being allowed to attend his civil hearing in person, nowhere does he provide a statute or other legal basis to implicate Defendant, *in her official capacity*. Hence, for reasons further explained below, the Court agrees with Defendants.

The United States, its federal agencies, and the heads of those agencies have long been protected by sovereign immunity. "[T]he United States, as sovereign, is immune from suit save as it consents to be sued." *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981); *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("By definition, federal law, not state law, provides the sources of liability for a claim alleging the deprivation of a federal constitutional right…the United States simply has not rendered itself liable under § 1346(b) for constitutional tort claims.").

While the Supreme Court has held that Congress can abrogate state sovereign immunity through legislation such as the Federal Tort Claims Act ("FTCA"), even the FTCA provides that federal government agencies and their officers remain immune. *See e.g.*, 28 U.S.C 2679 (a) ("The authority of any federal agency to sue and be sued in its own name shall not be construed to

authorize suits against such federal agency on claims which are cognizable…")

At relevant times to this suit, Blackensee was the Warden of FCI Otisville, a federal correctional facility part of the Bureau of Prisons ("BOP"). Hence, all actions she took in her official capacity are protected by sovereign immunity. *See Williams v. Metro. Det. Ctr.*, 418 F. Supp. 2d 96, 100 (E.D.N.Y. 2005) (explaining that where a correctional facility is part of the BOP, its wardens are protected by sovereign immunity absent a waiver). Plaintiff has not invoked a statutory exception for Blackanesee's sovereign immunity from Constitutional torts. Reading Plaintiff's complaint as liberally as possible, even if Plaintiff had invoked the FTCA, that statute would still not provide immunity for Defendant in her official capacity as Warden of a federal prison. *See Carno v. United States*, No. 17 CV 7998 (NSR), 2019 WL 2287966, at * 7 (S.D.N.Y. May 28, 2019) (dismissing FTCA claims against head of BOP on sovereign immunity grounds). Accordingly, Plaintiff's claims against Blackanesee, in her official capacity, are dismissed as a matter of law. *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994).

## II.     Claims Against Blackensee in her Individual Capacity

Plaintiff also seeks liability against Blackensee in her individual capacity. Individual liability against state officials, through either *Bivens* or Section 1983, hinges on the Court first finding an underlying constitutional violation. Therefore, the Court next assesses whether Plaintiff has plausibly pleaded a constitutional violation under any constitutional amendment. As Plaintiff raises a panoply of constitutional violations—under his First, Fifth, Sixth, and Seventh Amendment rights—the Court assesses each for plausibility. (*See* Compl. at 5.)

### *Fifth Amendment*

At its core, Plaintiff's Complaint alleges that he was denied meaningful access to the courts. As Plaintiff's grievance echoes of a classic due process violation, the Court begins its

assessment with the Fifth Amendment. The Due Process Clause of the Fifth Amendment provides that "[n]o person… shall be deprived of life, liberty, or property without due process of law…." It protects individuals against two types of government action. "Substantive Due Process" prevents the government from engaging in conduct that "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209 (1952), or interferes with rights "[i]mplicit in the concept of ordered liberty." *Palko v. State of Connecticut*, 302 U.S. 319, 324, 58 S. Ct. 149, 151 (1937). "Procedural Due Process" ensures that government cannot unfairly and without process deprive a person of life, liberty, or property. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893 (1976).

Plaintiff alleges that his procedural due process rights were violated because Defendant deprived him of his right to pursue his civil rights lawsuit. (Compl. at 5.) Specifically, Plaintiff claims that on the date set for his state court appearance for an assault and battery lawsuit, "defendant Warden refused to obey a court order, which directed her to deliver [ ] Plaintiff to the court by allowing the local Sheriff to take custody and control of the plaintiff." (*Id*. at 4.) Plaintiff claims that, consequently, his lawsuit was dismissed, "thereby causing [him] to be deprived of property to which he was entitled … in the sum of One Million Dollars." (*Id*. at 4.)

Defendants argue that no Fifth Amendment violation arises from such conduct because no constitutional amendment establishes that incarcerated plaintiffs have the right to appear in state court civil proceedings. (Defendants' Memorandum, ("Def. Mem."), ECF No. 25, at 7) (citing *Price v. Johnson*, 334 U.S. 266, 285 (1948); *Hernandez v. United States*, No. 99-cv-4303, 2000 WL 744148, at *2 (S.D.N.Y. June 8, 2000); *Hernandez v. Whiting*, 881 F.2d 768, 770 (9th Cir. 1989); *Holt v. Pitts*, 619 F.2d 558, 560 (6th Cir. 1980); *Perotti v. Quiones*, No. 10-cv0086, 2013 WL 4008188, at *1 (S.D. Ind. 2013)).

Plaintiff, however, argues that while he may not have the constitutional right to demand to be personally present in judicial proceedings, "[c]ourts enjoy discretion to secure a prisoner's presence at a trial through issuance of a writ of habeas corpus ad testificandum[,]" and unless the prison has a legitimate penological reason, it cannot refuse to honor a court's writ. (Plaintiff's Memorandum, ("Pl. Mem."), ECF No. 27, at 3-4.) In other words, Plaintiff is not arguing that the Warden violated his due process by simply denying him a request to attend a court hearing. His grievance is that the Warden unilaterally and arbitrarily decided not to honor a specific Court's transportation order, thereby encroaching the power of the Court and depriving him of meaningful access to the Court based on what the Court itself saw fit, which then caused him to be unable to litigate his lawsuit and suffer damages. The Court continues its analysis.

To begin, while Defendants argue that prisoners do not have a constitutional right to appear in state court for civil matters, all the cases they cite only support the proposition that prisoners have *no right to demand* being present in-person for hearings and that *courts have discretion to decide* whether or not to issue writs and orders for prisoners to be present. *See Price v. Johnson*, 334 U.S. 266 (holding that courts have the discretion to decide whether or not to issue a writ precisely because prisoners do not have the absolute right to be argue their own appeals or be present at proceedings in an appellate court); *Hernandez v. United States*, 2000 WL 744148 (explaining that because prisoners do not have the right to be present at their civil pre-trial proceedings, they also do not have the right to request participation in civil conferences by telephone); *Hernandez v. Whiting*, 881 F.2d 768 (explaining that because imprisonment suspends a plaintiff's usual right to be present at judicial proceedings, courts must take all reasonable steps to insure that prisoners raising seemingly meritorious claims have their day in court); *Perotti v. Quiones*, 2013 WL 4008188 (explaining that courts should assess various factors to decide whether

or not justice requires issuing a writ for an incarcerated defendant to appear in person for a civil hearing).

None of the cases cited by Defendants deal with the situation at-hand, which is whether custodians of inmates have the authority to defy writs of *habeas corpus* or transfer orders once a court has deemed the prisoner's appearance necessary. Therefore, Plaintiff's argument that a prison warden should not unilaterally be allowed to defy a court-order is not without bite.

Plaintiff's main obstacle to success on his due process claim is that the law treats prisoners' rights to access the courts differently for different types of litigation. For example, they distinguish between civil and criminal litigation. *See Price*, 334 U.S. at 285-86 ("a prisoner has no absolute right to argue his own [civil] appeal …that right is in sharp contrast to his constitutional prerogative of being present in person at each significant stage of a felony prosecution and to his recognized privilege of conducting his own defense at the trial."). Courts also tend to emphasize the stage of the proceedings when evaluating the prisoner's constitutional need to be present for them. *See e.g.*, *Heidelberg v. Hammer*, 577 F.2d 429 (7th Cir. 1978) (reversing district court's dismissal of prisoner's claim, where prisoner was not able to appear for trial because trial court should have considered postponing trial, having a deposition or bench trial, or compelling prisoner's presence through issuing a writ); *Holt v. Pitts*, 619 F.2d 558 (6th Cir. 1980) (holding that when a prisoner's civil action reaches the trial stage after surviving motions to dismiss and summary judgment, the trial court must take all reasonable steps to insure that the prisoner has his or her day in court).

Similarly, the law seemingly differentiates state versus federal court orders. For example, the U.S. Marshals' website segregates writs and orders that are issued by different courts. For orders from state civil courts, it states: "if provided with a properly executed court order, the U.S. Marshals *may* honor requests for producing federal prisoners in state civil cases." *See*

https://www.usmarshals.gov/prisoner/writs.htm (emphasis added). The webpage also has a subsection entitled: "Discretion in Honoring Writs," which explains:

> The U.S. Marshall is *not required to honor* a request for a federal prisoner in his or her custody *pursuant to state or local writ*. Generally, the writ is not honored until the completion of the prisoners' sentencing. In honoring a state or local writ, the USM will exercise discretion when a prisoner is a protected witness, has medical problems, or is a high security risk.

*Id*. (emphasis added). In contrast, when a prisoner is solicited through a federal writ, the webpage instructs that "[t]he U.S. Marshal *will* transport, maintain custody, and produce prisoner in a federal criminal action." *Id*. (emphasis added). Similarly, it instructs: "[t]he custodian of the prisoner *is responsible* for transporting and producing state or local prisoners in a federal civil case." *Id*. Hence, the website has mandatory language instructing Marshals and prisoners' custodians that they *must* comply with transportation and production orders in federal litigation, but it has *discretionary* language about their transportation obligations with respect to state orders.

Of course, while instructions on the U.S. Marshals' website are insightful, they are not authority for assessing constitutional rights. In order for the Court to assess whether it is constitutional for a prison warden to unilaterally defy a transport order issued by a state court of competent jurisdiction, the Court must assess: a) what litigation rights prisoners lose and retain when they are incarcerated, and b) how temporary transfer of inmates affects federal custody.

The court begins with the first inquiry. As stated earlier, prisoners have the right to argue their own cases involving life or liberty. *Price v. Johnson*, 334 U.S. at 279. Further, the Supreme Court has explained the "[t]he writ of *habeas corpus* has played a great role in the history of human freedom" because "[i]t has been the judicial method of lifting undue restrains upon personal liberty." *Id*. at 269. Indeed, the *habeas corpus* statute, 28 U.S.C. § 2243, commands custodians to produce inmates at hearings when presented with a writ of *habeas corpus*. *See Penn. Bureau of*

*Corr'n v. United States Marshals Service*, 474 U.S. 34, 106 S.Ct. 355 (1985); *Rivera v. Santirocco*, 814 F.2d 859, 861 (2d Cir. 1987). The Supreme Court has even pointed to Section 262 of the Judicial Code, which provides residual authority for other writs, and provides: "[t]he Supreme Court, the circuit courts of appeals, and the district courts shall have the power to issue all writs not specifically provided by statute, which may be necessary for the exercise of their respective jurisdictions and agreeable to the usages and principles of laws." *Id.* at 278-79. This language, known as the All Writs Act, permits the federal courts to issue an amalgam of other writs, when necessary and agreeable to the exercise of their jurisdiction.

Since the Supreme Court's decision in *Price*, courts around the country have held that it is within the district court's sound discretion to assess whether it is necessary to issue a writ of *habeas corpus* (or another) to procure a prisoner for a hearing. *See Perotti v. Quiones*, 2013 WL 4008188. In *Perotti*, for example, the Sixth Circuit elaborated that while it is incumbent on courts to issue writs to procure prisoners for their criminal matters, courts have the discretion to decide whether or not to grant prisoners' requests for writs that would enable them to appear in civil lawsuits. *Id.* at 560. The *Perotti* Court then went through various factors courts have used to make these determinations, such as: whether a prisoner's physical presence would contribute significantly to a fair adjudication of his claims, the costs and inconvenience of transporting a prisoner from his place of incarceration to the courtroom, any potential danger or security risk which the presence of a particular inmate would pose to the court, the substantiality of the matter at issue, the need of an early determination of the matter, the possibility of delaying trial until the prisoner is release, the probability of success on the merits, the integrity of the correctional system, and the interests of the inmate in presenting his testimony in person rather than by deposition etc. *Id.* at 560-61.

And, as stated earlier, several circuits have also focused on the stage of litigation, weighing proximity to trial in the prisoner's favor.

Based on the language in the Judiciary Act, the *habeas corpus* statutes, and case law, the Court finds that even for civil matters, once a federal court issues a writ of *habeas corpus* for a prisoner to be produced, the prisoner's custodian has a statutory duty to produce that prisoner, unless that custodian makes a showing for an exception. The present issue is only arguably less compelling because the Transport Order derived from a state court. Hence, the Court continues its assessment.

Certainly, the bulk of the case law cited by both parties involved federal courts' abilities to issue writs for the production of prisoners in federal civil lawsuits. This Court has been unable to find case law addressing the instant situation, where the transport order for civil litigation emanated from a state court. The Court, however, finds no equitable or jurisprudential reason why the principles derived from cases involving federal writs for inmates' civil litigation would not apply to state writs/orders for civil litigation. Certain scholars report that during the eighteenth and nineteenth century, "it was chiefly state courts that issued writs of habeas corpus, even to federal executive officials." *See* Anthony Gregory, *The Power of Habeas Corpus in America* (2013). (explaining that *habeas corpus* was originally a pre-trial mechanism employed by state courts as a check on federal officials, which is why *habeas corpus* appears in the Constitution before federal courts were even created). Hence, the Court finds that when either type of court issues a writ/transport order, its decision will be based on its competent assessment of: the need for the inmate, the stage of the litigation, location of the court, costs of transport, merits of the claims, progress of the suit, and necessity for oral argument.

Further, there is no question that a claimant can have a compelling interest life, liberty, or property in either court system. In fact, claimants frequently have greater due process stakes in their state court litigation—and the mere fact that they are in federal custody for a separate crime should not deprive them of their constitutional right to access courts and litigate their civil interests in the manner the state court has deemed fit.

This brings the Court to the important issue of custody. Certainly, it would be problematic for a court to weigh a prisoner's due process rights as more important their lost liberty right—i.e. society's right in ensuring that they remain in federal custody throughout their incarceration. But it is now well-established that surrendering a federal prisoner to the temporary physical custody and control of state officers does not result in a loss of federal jurisdiction over the prisoner. *Ponzi v. Fessenden*, 258 U.S. 254, 42 S. Ct. 309 (1922); *Rivera v. Santirocco*, 814 F.2d 859 (2d Cir. 1987). Further, no federal statute prohibits temporarily surrendering federal custody to a state court pursuant to writ of *habeas corpus*, or a similar order, and nor does such surrender require statutory authorization. *Id.* Again, the law actually reflects that an inmate's custodian *must* relinquish custody when presented with a formal writ of *habeas corpus*. *Penn. Bureau of Corr'n*, 474 U.S. 34; 28 U.S.C. § 2243. But, even when not mandated by *habeas corpus*, it is well-settled that temporarily relinquishing physical custody of an inmate to state authority does not waive federal jurisdiction over the prisoner. *Liberatore*, 574 F.2d at 89 (holding that "any 'loan' to the second sovereignty in compliance with such a writ or any other temporary transfer of custody from the sovereignty having the prior jurisdiction cannot affect in any way whatever any final judgment of conviction already entered against the prisoner").

Due to the unique structure of our dual sovereign government, a temporary custodial transfer between federal and state custody is appropriate in the spirit of reciprocal comity and mutual assistance needed to promote due and orderly procedure. *Ponzi*, 258 U.S. at 260-61:

> The forbearance which courts of co-ordinate jurisdiction, administered under a single system, exercise towards each other, whereby conflicts are avoided, by avoiding interference with the process of each other, is a principle of comity, with perhaps no higher sanction than the utility which comes from concord; but between state courts and those of the United States it is something more. It is a principle of right and of law, and therefore, of necessity. It leaves nothing to discretion or mere convenience. These courts do not belong to the same system, so far as their jurisdiction is concurrent; and although they coexist in the same space, they are independent, and have no common superior.

*Id*. (citing *Covell v. Heyman*, 111 U. S. 176, 4 Sup. Ct. 355). Because there is no way for the federal and state systems to which people are simultaneously bound to operate without friction, federal courts have repeatedly held that the federal government does not lose jurisdiction over a federal prisoner if it arranges to produce a prisoner in state court. *See e.g.*, *Truesdell v. United States*, 400 F.2d 859, 860 (8th Cir. 1968); *Murray v. United States*, 334 F.2d 616, 617 (9th Cir. 1964); *United States ex rel. William V. Fitzpatrick*, 299 F. Supp. 260, 261 (S.D.N.Y. 1969).

With that, the Court still recognizes that the case would be a much easier call if Plaintiff had been presented with a formal writ of *habeas corpus* from a federal district court or needed to attend a criminal proceeding, where his life or liberty were at stake. But because: 1) state courts also have strong interests in issuing writs/orders that enable them to fulfill their jurisdictional duties, 2) inmates have legitimate due process interests in their civil lawsuits, and 3) there is no risk of breaking federal custody when honoring a state writ/transport order, this Court holds that the principles governing federal civil hearings are largely the same for state civil hearings.

Therefore, the Court need not, and indeed should not, undertake a factual analysis about why the State Court issued the Transport Order. This court does not know what stage of litigation

that case reached, how meritorious the claims were, whether there had already been motion practice, the extent of Plaintiff's injuries, or anything related to that Court's assessment. Deference and comity to that Court's exercise of its sound discretion counsel against this court second-guessing its reason for issuing it.

The Transport Order clearly instructed:

> … the Superintendent of FCI Otisville is hereby authorized to release into the temporary custody of the Sheriff of Luzerne County or his proper Deputies for the purpose of attending a hearing scheduled for January 26, 2016, at 1:00 p.m. at the Luzerne County Courthouse, 200 North River Street, Wilkes-Barre Pennsylvania 18711 before the Honorable Tina Polachek Gartley.

> Defendant shall be housed at the Luzerne County Correctional Facility until further Order of this Court.

(Transport Order, Compl. at 7, ECF 9.)

Defendants offered no reason for why they defied the Order. While they loosely argue that Plaintiff may have appeared telephonically, the Court must accept as true Plaintiff's Complaint, which alleges that Plaintiff's inability to attend or participate in the proceeding resulted in his action being dismissed. (Compl. at 4.). Again, the Court construes Plaintiff's allegation as that, in defying the transport order, the prison denied him meaningful access to the Courts.[2]

Based on assessment of the limited case law in which prison wardens have defied court orders, courts have only upheld such defiance where the Warden's demonstrated legitimate

---

[2] If the evidence reveals that Plaintiff was able to meaningfully pursue his litigation, despite not being allowed to appear in person, the premise of the Complaint may dissolve. The Court again clarifies that eliminating the right to hearing can be constitutional, where there is an adequate alternative process in place. This principal was established when the Supreme Court held that the Due Process Clause of the Fifth Amendment can be satisfied without a hearing, so long as there is sufficient written notice and written procedures in place that one can avail before being deprived of life, liberty, or property. *Mathews v. Eldridge*, 424 U.S. 893; *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191 (1965) ("The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."); *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 646 (1951) ("the right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.")

interests of state government. *See e.g.*, *Matter of Warden of Wisconsin State Prison*, 541 F.2d 177 (7th Cir. 1976) (reversing and remanding for further fact-finding the district court's decision against warden who failed to produce inmate for federal civil action, where warden argued that there were administrative, expense and logistical hindrances to the inmate's production and that district court had not weighed inmates' needs against state's needs in maintaining custody for all inmates); *Hernandez v. Whiting*, 881 F.2d at 770 (reversing and remanding district court's dismissal of inmate's civil rights lawsuit where he was unable to appear for proceedings and trial and no legitimate reasons were proffered by court or custodians for denying him the opportunity).

The Court has found no case law to support the Government's argument that prison officials may unilaterally and arbitrarily defy state writs ordering the production of a prisoner in federal custody. And Defendant correctly notes that there is at least some Supreme Court authority requiring a penological interest for prisons to interfere with prisoners' collateral civil legal rights. *Turner v. Safley*, 482 U.S. 78, 107 S. Ct. 2254 (1987) (holding that prison could not restrict inmates' abilities to get legal marriage absent legitimate penological objectives).

Hence, the Court agrees with Plaintiff that absent any showing or proffered reason, a prison cannot arbitrarily deprive an inmate of a right to appear for litigation that he has received pursuant to a court order. *Turner*, 482 U.S. at 107.

Importantly, this does not mean that the Court will set a high bar for assessing the reasons given by the federal prison. The Court is aware that there are two legitimate competing interests. One is the right of the prisoner, which derives from his due process rights to have access to the courts, and which only became a right to physically appear in court when the State Court issued its Transport Order. The other is the right of the federal facility to advance the justifiable purposes of imprisonment. *See Morales v. Schmidt*, 494 F.2d 85, 87 (7th Cir. 1974). It could very well be

that the prison's penological or administrative interests will outweigh Plaintiff's rights. Such a showing has not yet been made. And the Court could easily fathom facts where a prisoner's interests exceed the prison's legitimate penological interests. Hence, allowing prison wardens to arbitrarily and unjustifiably defy court-issued orders is dangerous and raises constitutional concerns. At this juncture, the Court accepts that the prison gave *no* reason for its action. That is an insufficient basis for it to deny a prisoner's rights. Accordingly, based on a liberal construction of Plaintiff's allegations, the Court finds that Plaintiff has just pleaded a plausible Fifth Amendment claim.

### *First Amendment*

Reading Plaintiff's complaint as liberally as possible, Plaintiff claims that his First Amendment was violated because Defendant retaliated against him for filing a lawsuit by preventing him to attending his scheduled court proceeding. Defendant states that Defendant had no reason refuse him to permit his scheduled court proceeding other than retaliation, spite, and her desire to inflict punishment on him. (Compl. at 4.)

The First Amendment guarantees all individuals the freedoms of speech, press, and assembly. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 556 (1980) And it assures freedom of communication on matters relating to the functioning of government. *Id.* at 575. In addition, "Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988). With regards to retaliation, the Second Circuit cautions courts to recognize "the ease with which claims of retaliation may be fabricated" and therefore, to handle prisoner retaliation "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d. Cir. 1995).

To make a *prima facie* First Amendment retaliation claim, a plaintiff must allege: (1) That he engaged in speech or conduct that was protected; (2) the defendant took an adverse action against the Plaintiff; and (3) That there was a causal connection between the protected speech and the adverse action. *Mt. Health City School Dist. Bd. of Educ. V. Doyle*, 429 U.S. 274 (1977); *Gil v. Pidlypchak*, 389 F.3d 379, 380 (2d. Cir. 2004).

Here, Plaintiff engaged in protected conduct as Plaintiff's pursuit of his civil lawsuit constitutes protected conduct. *Espinal v. Goord*, 558 F.3d. 119, at 128-29 (2d Cir. 2009). As to an adverse action, in the prisoner context, a plaintiff must allege facts showing that the claimed retaliatory acts were not merely a de minimis act of harassment but rather, could deter a "similarly-situated person of ordinary firmness from exercising his or her constitutional rights." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir. 2001). This is an objective test," meaning it does not turn on whether the Plaintiff was in fact deterred from continuing to file his grievances." *Allah v. Poole*, 506 F.Supp.2d 174 (S.D.N.Y. August 14, 2007).

Here, the Court finds that Plaintiff's allegations—that he was not allowed to participate in his litigation at all—are not *de minimis* but rather of the nature that would deter a similar situated person of ordinary firmness from exercising his constitutional rights.[3] Hence, insofar as Plaintiff asserts that he was completely precluded from participating in the proceeding, despite a Court order requesting his appearance, such preclusion would deter a similarly situated person of ordinary firmness from exercising his constitutional rights. Plaintiff meets the second element.

---

[3] Interestingly, Defendants brief provides that Plaintiff *was* able to participate in the conference, *albeit telephonically*, whereas the Complaint states that Plaintiff was more generally not allowed to "attend the scheduled court proceeding." (Compl. at 4.) The facts underlying this discrepancy may be material to the ultimate outcome of this claim. But because the Court is required to accept the pleadings as true, and read the Complaint as liberally as possible, it presently assumes that Plaintiff was unable to participate in his litigation.

Lastly, in order to allege a causal connection between the protected speech and adverse action, plaintiff's allegations must support an inference that his speech played a substantial part in the adverse action. *Davis v. Goord*, 320 F.3d 346 (2d Cir. 2003). Circumstantial evidence is sufficient to support the existence of a causal connection between the protected conduct and the adverse action. *See Colon v. Coughlin*, at 872 (2d Cir.1995) ("temporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation"). Here, Plaintiff claims that the retaliatory act occurred simultaneously to his protected speech—i.e. he was denied the opportunity to appear for his court appearance, which was the protected speech. Therefore, the Court determines that there is a causal relationship between the retaliatory and protected conduct. Hence, Plaintiff has pleaded a plausible First Amendment retaliation claim.

### Sixth Amendment

The Sixth Amendment provides as follows:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

U.S. Const. Amend. VI. Nowhere in the Complaint does Plaintiff allege anything related to a criminal trial or lawsuit. Plaintiff's instant case is a civil action in which he essentially complains about retaliation and lack of due process in another civil action. Accordingly, Plaintiff's Sixth Amendment claim is conclusory and facially deficient, and it fails to plausibly assert a Sixth Amendment constitutional violation.

### Seventh Amendment

The Seventh Amendment provides:

> In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any court of the United States, than according to the rules of the common law.

U.S. Const. Amend. VII. Similar to Plaintiff's Sixth Amendment claim, Plaintiff asserts no facts anywhere in his complaint alleging that he was denied his right *to a civil jury trial*, let alone that it was due to Defendant's conduct. Rather, he loosely states that his other "lawsuit was dismissed" and that he was "deprived of property to which he was entitled." (Compl. at 4.)

At best, Plaintiff is trying to argue that he lost his other law suit because he was not allowed to appear in court. But that is the claim that falls under his Fifth Amendment due process rights. He has not mentioned anything about losing his right to a jury anywhere. This lack of specificity is not sufficient for the plausibility threshold for Rule 12(b)(6), as a *pro se* plaintiff is still bound by the plausibility requirements articulated in *Twombly* and *Iqbal*. *Thomas v. Calero*, 824 F. Supp. 2d 488, 497. Accordingly, this claim, too, is facially deficient and is dismissed on the pleadings.

Having decided that Plaintiff has pleaded cognizable violations of his First and Fifth Amendment rights, the Court turns its attention to whether Plaintiff can seek redress from Defendant in her individual capacity through a *Bivens* or Section 1983 action.

### III. *Bivens* is Inappropriate to Seek Equitable Relief

Defendants next argue that Plaintiff's effort to bring claims against Blackensee in her individual capacity under *Bivens* are improper because Plaintiff seeks equitable relief, whereas *Bivens* is an avenue to monetary damages. The Court agrees.

To the extent Plaintiff seeks equitable relief in the form of a judgment related to his civil claim, (*see* Compl. at 5) ("*Judgment* against the defendant on his claim for compensatory damages in the sum of One Million Dollars"), Defendants are correct that equitable relief is not accessible through *Bivens*. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66, 122 S.Ct. 515, 519 (2001) ("In

*Bivens* ... we recognized for the first time an implied *private action for damages* against federal

officers alleged to have violated a citizen's constitutional rights.") (emphasis added); *Schweiker v.*

*Chilicky*, 487 U.S. 412, 421, 108 S.Ct. 2460, 2466 (1988) ("In [*Bivens*], this Court held that the

victim of a Fourth Amendment violation by federal officers acting under color of their authority

may bring *suit for money damages* against the officers in federal court.") (emphasis added).

Accordingly, any request for equitable relief vis-à-vis *Bivens* is denied as a matter of law.


### IV.     *Bivens* is Appropriate to Seek Monetary Damages in this Context

To the extent that Plaintiff seeks monetary damages from Defendant for, such damages are

potentially available through *Bivens*, provided that Plaintiff can first make out that his infringed

constitutional rights are redressable through *Bivens*. The Court therefore next turns its attention to

assessing which, if any, of Plaintiff's alleged violations may be pursued through a *Bivens* action.

While *Bivens* originally allowed a private right of action to be pursued under the Fourth

Amendment, the Supreme Court has itself extended *Bivens* to the Fifth Amendment's Due Process

Clause and the Eighth Amendment's Cruel and Unusual Punishment Clause. *See Davis v.*

*Passman*, 442 U.S. 228, 99 S. Ct. 2264 (1979) (extending *Bivens* to the Fifth Amendment);

*Carlson v. Green*, 446 U.S. 14, 100 S. Ct. 1468 (1980) (extending *Bivens* to the Eight Amendment).

Beyond those amendments, the Supreme Court has instructed courts to take a "cautious" approach

and not accept *Bivens* claims in new contexts. *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ("expanding

the *Bivens* remedy is now considered a "disfavored" judicial activity.").

Here, in order for Plaintiff to recover monetary damages for his alleged First and Fifth

Amendment violations, the Court would have to find that his claim can appropriately proceed

under a *Bivens* theory. To do so, the Court must apply the two-step test set by the Supreme Court

in *Ziglar*. Under this test, a court must first decide whether a claim "presents a new *Bivens* context."

*Id.* at 1859. If so, the court must then proceed to a "special factors" analysis and decide "who should decide whether to provide for a damages remedy, Congress or the courts[.]" *Id.* at 1857.

Turning to the first prong of this test, the Court finds that Plaintiff's claim arises in a new *Bivens* context. The Court takes a cue from the procedural history in *Abassi*, where the Second Circuit tried to expand the *Bivens* remedy to new contexts in order to provide monetary damages for numerous illegal aliens who had been taken into allegedly unconstitutional detention in the aftermath of 9/11. The Supreme Court reversed the decision of the Second Circuit, explaining that it has only approved three types of *Bivens* claims in the past: (1) a Fourth Amendment "claim against FBI agents for handcuffing a man in his own home without a warrant", (2) a Fifth Amendment "claim against a Congressman for firing his female secretary", and (3) and Eighth Amendment "claim against a prison official for failure to treat an inmate's asthma." *Id.* at 1860 (citations omitted cases).

The Supreme Court explained that "[i]f the case is different in a meaningful way from [these] previous *Bivens* cases decided by the Supreme Court, then the context is new." *Id.* at 1859. Hence, even if a claim were to arise under the same amendment as was allowed in a previous *Bivens* context, the Court explained that meaningful differences could be based on "the rank of the officers involved; the constitutional right at issue; the extent of judicial guidance for the official conduct; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors not considered in previous *Bivens* cases." *Id.* at 1858. It mandated that in order to apply *Bivens* to a new context, courts had to engage in a "special factors" analysis, and that "even a modest extension is still an extension [of *Bivens*.]" *Id.* at 1864.

Here, Defendant's failure to produce Plaintiff in person for a pre-trial hearing in a civil state court action, whether viewed as retaliatory under the First Amendment or an infringement of

Plaintiff's due process rights under the Fifth Amendment, is conduct that only bears some resemblance to the past *Bivens* cases recognized by the Supreme Court. Namely, it resembles *Davis v. Passman*, 442 U.S. 228, insofar as it directly arises out of Plaintiff's due process rights under the Fifth Amendment to the U.S. Constitution. But given the Supreme Court's express guidance on what constitutes a "meaningful difference," this Court finds that because the cases involve different actors – *Passman* involved a U.S. Congressman who violated the equal protection component of the due process clause, whereas the instant case involves a U.S. prison warden who violated the due process clause for defying a court transport order – this Court is compelled to conduct a special factors analysis to determine the propriety of applying *Bivens*.

In *Abassi*, the Supreme Court first urged courts to consider statutory intent, instructing that "[i]f the statute itself does not 'display an intent' to create 'a private remedy' … courts may not create one no matter how desirable that might be as a policy matter…" 137 S.Ct. at 1856. At the same time, the Court also stated that "[t]he decision to recognize an implied cause of action under a statute involves somewhat different considerations than when the question is whether to recognize an implied cause of action to enforce a provision of the Constitution itself." *Id.*

This Court finds that this first factor weighs heavily in favor of granting *Bivens* redress. Plaintiff's claims rise squarely out of the Constitution. His due process claim is not tethered to any statute and goes to the core protection in the Fifth Amendment's due process clause. In *Passman*, the Supreme Court reversed the Court of Appeals when it failed to properly distinguish statutory rights and constitutional rights. *See* 442 U.S. 228, 240 ("the question of who may enforce a statutory right is fundamentally different from the question of who may enforce a right that is protected by the Constitution."). It emphasized that while it is appropriate for Congress to determine the remedies for statutory rights, for Constitutional rights, "the judiciary is clearly

discernible as the primary means through which these rights may be enforced." *Id*. at 241-42 ("we presume that justiciable constitutional rights are to be enforced through the courts.").

This relates to another very important factor the Supreme Court urged lower courts to consider, which is separation of powers principles. *Abassi,* 137 S.Ct. at 1857. That is, the Supreme Court insisted that courts very carefully ask "who should decide" whether monetary damages are available for a particular wrong – Congress or the courts. *Id*.

Here, again, the Court finds that the answer in this particular instance is the courts. The Court agrees that in the vast majority of cases, and most especially where rights are tethered to statutes, it will be far more appropriate for Congress to assess the economic and governmental concerns related to allowing Plaintiffs to recover monetary damages from federal employees. But here again, because Plaintiff's right is not one that derives from a statute or one that case law has read into the Fifth Amendment, but one that originates directly from the heart of the Fifth Amendment, it is even more directly tied to the Fifth Amendment than the rights that were vindicated through monetary damages in *Passman*. And again, in *Passman*, the Supreme Court itself explained why it was crucial to allow courts to decide if Plaintiffs to recover money damages from federal officials when their constitutional rights were directly infringed:

> And unless such rights are to become merely precatory, the class of those litigants who allege that their own constitutional rights have been violated and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the court for the protection of their justiciable constitutional rights. "The very essence of civil liberty," wrote Mr. Chief Justice Marshall in *Marbury v. Madison*, "certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." Traditionally, therefore, "it is established practice of this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution and to restrain individual state officers from doing what the 14th Amendment forbids the State to do."

442 U.S. at 243 (citations omitted). Hence, this Court does not find allowing money damages under the Fifth Amendment to be judicial overstepping. Quite the opposite. Relegating the vindication of Constitutional rights to Congress would be depriving federal courts of their principal function.

Other factors this Court considers is whether there is any other route for Plaintiff to get a remedy and whether equitable remedies are more appropriate. The Court finds the answers to both questions to be no. As this Court discussed at the onset, there is no statutory avenue available for Plaintiff because the Federal Tort Claims Act shields Defendant in her official capacity and Section 1983 only applies to state actors.

As for equitable remedies, where a Plaintiff loses access to the Courts, there is often no way to reverse that equitable damage. Doctrines like statutes of limitations and *res judicata* can have finality that bars Plaintiffs from simply re-litigating the issues they attempted to raise. Courts are weary to unravel their own determinations or give Plaintiff's two bites at the apple. In short, where the harm is irreparable equitable harm, the only damages a Plaintiff can attempt to retrieve may be monetary. The Supreme Court acknowledged so much in *Abassi*. 137 S.Ct. at 1858. ("It is true that if equitable remedies prove insufficient, a damages remedy might be necessary to redress past harm and deter future violations.") The Court finds that to be the case here. Regardless of what costs such remedies may impose on the executive branch, absent a route to monetary damages, there would simply be no way to deter executive officials like prison wardens from violating Plaintiff's due process rights with impunity. Not allowing a route to civil damages would be akin to the Court passing a blanket immunity for such officials in their individual capacities, which neither Congress nor the Constitution has done.

Lastly, the Court considers whether there is any cause for hesitation—*i.e.* a sound reason for the Court to "doubt the efficacy or necessity of a damages remedy as part of the system of

enforcing the law." *Id.* The Court has already belabored why it believes that there is no reason for the Court's to hesitate in providing a damages remedy in this context and why there would be a very strong reason to pause before *dis*allowing it—without civil liability, there would be little incentive for federal employees and officials to refrain from violating the Constituion. In *Passman*, the Supreme Court reminded us that our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law:

> No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it.

442 U.S. at 246 (citations and internal quotation marks omitted).

Accordingly, based on an assessment of numerous special factors the Supreme Court has emphasized, the Court holds that should Plaintiff's claim survive motion practice and yield liability on the merits, under *Bivens*, Plaintiff could recover monetary damages.

## V.     Section 1983 is Inapplicable

While Plaintiff attempts to bring claims pursuant to 42 U.S.C. 1983, (Compl. at 5), Plaintiff's claims are a warden of a federal correctional facility operated by the BOP. As such, the appropriate redress for him to recover damages, if any, is through *Bivens* and not through Section 1983. *See Bivens*, 403 U.S. at 406. Accordingly, any claims alleged against Defendant under Section 1983 are dismissed as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part. All claims against Defendant Blackensee in her official capacity are dismissed as a matter of law. All claims against Blackensee under Section 1983 are dismissed as a matter of law. All of Plaintiff's claims against Blackensee in her individual capacity under *Bivens* are dismissed except for Plaintiff's Fifth and First Amendment claim. Given that this is Plaintiff's second amended complaint, Plaintiff will not receive further opportunities to amend his complaint.

The parties are directed to confer and submit a case management plan (attached) by July 12, 2019. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 24, mail a copy of this Opinion and Order to Plaintiff at his last address listed on ECF, and to show proof of service on the docket.

Dated:   June 11, 2019                        SO ORDERED:
        White Plains, New York

_____
NELSON S. ROMÁN
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Rev. May 2014

-------------------------------------------------------------x

                                                    **CIVIL CASE DISCOVERY PLAN**
                              Plaintiff(s),          **AND SCHEDULING ORDER**

        - against -


                              Defendant(s).          _____ CV _____ (NSR)


-------------------------------------------------------------x

        This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with
counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

    1.      All parties [consent] [do not consent] to conducting all further proceedings before
            a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c).
            The parties are free to withhold consent without adverse substantive consequences.
            (If all parties consent, the remaining paragraphs of this form need not be
            completed.)

    2.      This case [is] [is not] to be tried to a jury.

    3.      Joinder of additional parties must be accomplished by _____.

    4.      Amended pleadings may be filed until _____. Any party
            seeking to amend its pleadings after that date must seek leave of court via motion.

    5.      Interrogatories shall be served no later than _____, and responses
            thereto shall be served within thirty (30) days thereafter.  The provisions of Local
            Civil Rule 33.3 [shall] [shall not] apply to this case.

    6.      First request for production of documents, if any, shall be served no later than
            _____.

    7.      Non-expert depositions shall be completed by _____.

        a.      Unless counsel agree otherwise or the Court so orders, depositions shall not
                be held until all parties have responded to any first requests for production
                of documents.

        b.      Depositions shall proceed concurrently.

        c.      Whenever possible, unless counsel agree otherwise or the Court so orders,

non-party depositions shall follow party depositions.

8.      Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9.      Requests to Admit, if any, shall be served no later than _____.

10.     Expert reports shall be served no later than _____.

11.     Rebuttal expert reports shall be served no later than _____.

12.     Expert depositions shall be completed by _____.

13.     Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14.     **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15.     Any motions shall be filed in accordance with the Court's Individual Practices.

16.     This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17.     The Magistrate Judge assigned to this case is the Hon. _____.

18.     If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19.     The next case management conference is scheduled for _____, at _____.  (The Court will set this date at the initial conference.)


SO ORDERED.

Dated:  White Plains, New York
        _____

                                                _____
                                                Nelson S. Román, U.S. District Judge